UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| TITUS GROUP, INC., | : |
| Plaintiff, | : Civil Action No.: |
| v. | : |
| ADVOQUE SAFEGUARD LLC, PAUL JAY SHRATER, ANDREW STACK, AND JASON AZEVEDO, | : **COMPLAINT** |
| Defendants. | : |

---

Plaintiff Titus Group, Inc. ("**Titus**"), for its Complaint against Defendants Advoque Safeguard LLC ("**Advoque**"), Paul Jay Shrater ("**Shrater**"), Andrew Stack ("**Stack**"), and Jason Azevedo ("**Azevedo**") (Shrater, Stack, and Azevedo are collectively the "**Individual Defendants**"), alleges as follows:

**SUMMARY**

1.   In the summer of 2020, at the height of the COVID-19 global pandemic, Advoque sold 3,069,000 foldable style N95 Particulate Filtering Respirators to Titus. Immediately after Titus paid for the last batch of respirators, the National Institute for Occupational Safety and Health ("**NIOSH**")[1] revoked its approval for Advoque's respirators, meaning that none of the respirators could be used or sold.

2.   Advoque initially implied that NIOSH's results were not valid by questioning how NIOSH's "limited samples were stored or handled" prior to testing. Advoque also assured Titus

---

[1] NIOSH operates within the Centers for Disease Control and Prevention ("**CDC**"). The National Personal Protective Technology Laboratory ("**NPPTL**") is a division of NIOSH that tests personal protective technologies for the CDC and NIOSH.

that it would gain NIOSH approval within a matter of weeks and would then exchange any existing inventory for NIOSH-approved products. Advoque stalled for more time.

3. After months of excuses, Titus finally had waited long enough. Titus returned the first batch of 1,633,944 of the defective N95 respirators in December 2020. Advoque refused to refund any of the money that Titus had paid for the defective respirators.

4. What Titus later learned about Advoque's conduct was more shocking. Rather than paying refunds for their defective products, the Individual Defendants—the founders and owners of Advoque—transferred to themselves, other insiders (and their affiliated entities) millions of dollars from Advoque, including approximately $7.2 million in distributions and two-thirds of a $6,145,599.95 commission, at a time when, on information and belief, Advoque was insolvent.

5. Titus files this action to recover the amounts it paid to Advoque for the defective N95 respirators and to hold the Individual Defendants responsible for their attempt to hinder, delay, and defraud Advoque's creditors.

## PARTIES, JURISDICTION AND VENUE

6. Titus is a Delaware corporation with its principal place of business at 14580 Midway Road, Dallas, TX 75244.

7. On information and belief, Advoque is a Delaware limited liability company with its principal business address at 1040 Richard Ave., Santa Clara, CA 95050, and may be served through its registered agent, Andrew W. Stack at 1040 Richard Ave., Santa Clara, CA 95050.

8. On information and belief, Shrater is a California resident who resides at 318 Golden Grove Ct., Simi Valley, CA 93065-6706, and may be served at his domicile or his regular place of business at 1040 Richard Ave., Santa Clara, CA 95050.

9. On information and belief, Stack is a California resident who is domiciled at 2111 Barbara Drive, Palo Alto, CA 95303-3446 and may be served at his domicile or his regular place of business at 1040 Richard Ave., Santa Clara, CA 95050.

10. On information and belief, Azevedo is a California resident who is domiciled at 2314 Robinson Street, Redondo Beach, CA 90278-2137 and may be served at his domicile or his regular place of business at 1040 Richard Ave., Santa Clara, CA 95050.

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse, and the amount in controversy exceeds $75,000.

12. Titus is a Delaware corporation with its principal place of business in Texas and, therefore, a citizen of Delaware and Texas.

13. Advoque is a Delaware limited liability company so its citizenship depends on the citizenship of its members. On information and belief, the members of Advoque are Andrew Stack (a citizen of California), Minimus Brands LLC, and JSK LLC. All of the members of Advoque are affiliated with, or owned by, the officers and founders of Advoque, a California business. Stack is the Chief Operating Officer and Co-Founder of Advoque. As explained in more detail below, Minimis Brands, LLC is an entity owed by Shrater (Advoque's Chief Business Officer and Co-Founder). JSK LLC is an entity owned by Jason Azevedo (Azevedo's Chief Executive Officer and Co-Founder), Keven Azevedo (Advoque's Chief Operations Officer and Co-Founder), and Steve Hermosillo (Advoque's Chief Creative Officer and Co-Founder).[2] On information and belief, the sole member of Minimus LLC is Shrater. On information and belief, the members of JSK LLC are Jason Azevedo, Steve Hermosillo, and Keven Azevedo. Steve Hermosillo's domicile is believed to be in Woodland Hills, California at 4328 Tosca Road, Woodland Hills,

---

[2] "JSK" is believed to refer to the first names Jason, Steve, and Keven, three of Advoque's founders.

California 91364. Keven Azevedo's domicile is believed to be in Santa Clara at 359 Pineview Drive, Santa Clara, California 95050.

14. This Court has personal jurisdiction over Advoque because, in the Manufacturing Agreement, Advoque consented to the exclusive jurisdiction of the state and federal courts in the State of New York.

15. This Court has jurisdiction over the Individual Defendants because they are the founders and principals of the closely held Advoque and because each of the Individual Defendants had substantial connection to the transaction and claims at issue.

16. Venue is proper in this Court because, at Advoque's insistence, the Manufacturing Agreement included the following provision: "Exclusive jurisdiction and venue for any action or dispute arising out of or relating to this Agreement or any SOW hereunder shall be in the state and federal courts for New York County, New York, and the Parties hereby consent to the jurisdiction and venue of such courts and waive any claim of forum non conveniens." Manufacturing Agreement, § 14; *see also, Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for the Western Dist. of Texas*, 571 U.S. 49 (2013) (noting that forum-selection clauses should control except in unusual cases).

## FACTS

A. **Advoque agrees to supply Titus with NIOSH-approved N95 respirators.**

17. In approximately June 2020, Titus's Chief Operating Officer, Jordan Miller, contacted Advoque about possibly buying N95 respirators from Advoque. Advoque had recently been awarded a $90 million contract to supply N95 respirators to the State of California.

18. On or about July 27, 2020, Titus and Advoque signed a Master Manufacturing and Supply Agreement and Statement of Work (collectively "**Manufacturing Agreement**") under

which Titus would purchase "certain personal protective equipment for resale" by Titus.  A true and correct copy of the Manufacturing Agreement is attached as **Exhibit A**.

19. Advoque agreed to sell 3,000,000 foldable style N95 Particulate Filtering Respirators to Titus at a price of $2.25 per respirator.

20. Advoque's respirators were required to meet or exceed NIOSH's standards for "N95" respirators.  Advoque agreed that the Products[3] would "meet or exceed certain minimum specifications" ("**Specifications**") including: "(a) the "N95" air filtration rating from the National Institute for Occupational Safety and Health ('NIOSH')"; and (b) the specifications prescribed by applicable United States federal laws and the laws of the State of California governing the manufacturing, packaging, labeling, advertising, production, promotion, marketing, sale, and resale of such Products, including all applicable regulatory and other testing and/or certification requirements for the Products ("**Laws**").

21. Advoque expressly "represent[ed] and warrant[ed] to [Titus] that . . . the Products will be free from all material defects [and that the] . . . Products shall strictly conform to the Specifications and shall be merchantable, fit for their intended purpose, and free from defects in design, material, and workmanship at the time of such delivery." Ex. A (Manufacturing Agreement) § 9.

22. Advoque also agreed that it "shall ensure that the manufacture, storage, packaging, labeling, and transportation of Products shall be performed in a good and workmanlike manner and in compliance with the Specifications and all other provisions of the applicable SOW and this Agreement." Ex. A (Manufacturing Agreement) § 2.

---

[3] Under Statement of Work #1, which is attached as part of Exhibit A, Advoque was supplying "foldable style "N95" respirators meeting the Specifications." *See* Ex. A (Manufacturing Agreement), § 1(a) of SOW. Titus refers to such Products in this Complaint as the "respirators."

23. Pursuant to the Manufacturing Agreement, Advoque agreed that all lots would be tested to confirm compliance with the N95 Specifications. *See* Ex. A (Manufacturing Agreement) § 4. Specifically, Advoque agreed:

- Manufacturer shall be responsible for testing of Products for Defects[4] prior to shipment, at Manufacturer's expense.

- Manufacturer shall maintain and retain books and records as required by applicable law pertaining to the manufacture and testing, including without limitation sufficient books and records to ensure the Parties' ability to perform a complete lot history via lot and batch tracing of Products and to otherwise ensure compliance with Laws ("Test Records"), for the period required by applicable Laws. Manufacturer shall provide written notice to Purchaser of, and reasonable information about, any audits, inspections, or investigations by any regulatory authority directed towards Products or facilities used in the manufacture of Products, to the extent such audits, inspections, or investigations (a) materially adversely affect Manufacturer's ability to provide Products complying with the Specifications or (b) are likely to materially delay delivery of Products pursuant to any SOW.

24. The SOW also included "Additional Terms" under which Titus could return any of the first 3,000,000 units to Advoque for a full refund that had to be paid within 15 days of receipt of the returned products. *See* Ex. A (SOW) § 4.

25. On or about August 20, 2020, Titus's Chief Operating Officer, Jordan Miller visited the Advoque manufacturing facility at 1040 Richard Ave, Santa Clara, California, and toured the facility with founders Stack, Azevedo, and Shrater.

26. During the tour, the Individual Defendants emphasized that Advoque was one of the few U.S. manufacturers of N95 respirators whose products had been approved with "N95" air filtration rating from NIOSH. The Individual Defendants also emphasized Advoque's quality control process, and showed Titus the machine that tested the N95 respirators, as well as the log

---

[4] "Defects" were defined as "any discrepancies with respect to the SOW, including, but not limited to any discrepancies or deficiencies in the quantity or quality of the Products, or non-conformance with Specifications."

book Advoque used to track each test. The Individual Defendants told Titus that the lot number is written on each box of 50 N95 respirators and that each lot is tested to confirm that the lot meets or exceeds N95 standards.

27. After this tour and in reliance on the statements of the Individual Defendants, Titus caused two payments of $1,150,850.00 to be wired to Advoque on August 21, 2020 and August 28, 2020.

28. Titus paid a total of $6,827,575 to Advoque for Products (as defined in the Manufacturing Agreement).

29. Titus made the following payments to Advoque on the following dates:

- July 28, 2020:  $1,687,500.00
- August 10, 2020: $1,687,500.00
- August 14, 2020: $556,875.00
- August 17, 2020: $594,000.00
- August 21, 2020: $1,150,850.00
- August 28, 2020: $1,150,850.00

**B.      Revocation of NIOSH/CDC Approval and Advoque's Hostage-Style Legal Script.**

30. On the same date that Titus made its last payment to Advoque, the CDC/NIOSH was testing Advoque's respirators. On or about August 28, 2020, the NPPTL tested ten Advoque respirators to determine whether the respirators satisfied the filtering requirements for NIOSH-approved "N95" respirators.

31. All ten Advoque respirators failed testing.

32. On or about September 10, 2020, Advoque CEO Shrater called Titus's COO Jordan Miller and, for several minutes, read a script that sounded like it had been drafted by a lawyer. Shrater told Miller that, effective immediately, the Advoque Safeguard N95 Particulate Filtering

Respirator could not be considered NIOSH-Approved and that these respirators could no longer be sold or used as "N95" respirators in the United States.

33. On Friday, September 11, 2020, Co-Founder & Chief Technical Officer Jason Azevedo issued a letter to Advoque customers and distributors, stating that the Advoque respirators could no longer be sold or distributed as a NIOSH-approved product. A true and correct copy of Advoque's September 11, 2020 letter is attached as **Exhibit B**.

34. The respirators that Titus had purchased from Advoque, and the boxes in which the Respirators were packaged, were all labeled as "NIOSH N95."

35. None of the respirators that Titus has purchased from Advoque could be legally sold in the United States.

36. All of the respirators sold to Titus were worthless—worth less than the cost of shipping the respirators back to Advoque.

## C. Advoque's Principals Stall Creditors for More Time While Draining Millions of Dollars in Cash From Advoque.

37. On September 16, 2020, a week after NIOSH revoked Advoque's certification for its N95 respirators, Advoque CEO Paul Shrater issued another statement to customers and distributors:

> Unfortunately the conditions around how the limited samples tested were stored or handled prior to the receipt by NIOSH of the samples are unknown. We remain focused on investigating and resolving the situation as quickly as possible. The quality and reliability of our product is our top priority.
>
> To be clear, we have not been asked by NIOSH to conduct a recall and we are not conducting a recall. Nevertheless, we have established a product replacement program as a courtesy to our customers. This program will allow our customers to exchange their existing inventory for NIOSH-approved products, following NIOSH conventional approval of our product. That approval process is well underway, with the review process expected to be completed within 2 weeks.

38. Advoque's replacement respirator did not receive NIOSH approval until on or about January 15, 2021—four months later. Shrater knew or should have known that the review process would not be completed within weeks.

39. Throughout October, November and December 2020, Advoque continued to assure Titus that new NIOSH approval was coming and that the non-compliant products could be returned for a refund. In reliance on Advoque's assurances, Titus continued to give Advoque more time to solve the problem.

40. On or about December 28, 2020, Titus returned 1,633,944 Advoque respirators to Advoque. These returns were within the deadline for the automatic refund provided by Section 4 of the SOW because Titus and Advoque had extended that deadline by written agreement signed by both parties.

41. By letter dated January 14, 2021, Titus demanded payment of the $6,827,575 that Titus had paid Advoque for the defective "N95" respirators.

42. Advoque refused to provide Titus with any refunds for any products.

43. Advoque and the Individual Defendants stalled Titus to enrich themselves. On information and belief, Advoque distributed a $6,145,599.95 "commission" (most of which was paid to Advoque insiders) and a $7,200,000 dividend or distribution to the Advoque principals.

44. In addition, on information and belief, Advoque paid Ciasom, LLC, a company controlled by Azevedo, millions of dollars in alleged "reimbursements."

45. In other words, Titus paid Advoque tens of millions of dollars for "N95" respirators that could not be sold or used, but, rather than paying refunds to Titus as legally obligated, the principals of Advoque paid themselves tens of millions of dollars.

46. On information and belief, during the period of time from August 28, 2020 until December 31, 2020, Advoque made one or more distributions or payments to Stack (and/or an entity owned or controlled by Stack).

47. On information and belief, during the period of time from August 28, 2020 until December 31, 2020, Advoque made one or more distributions or payments to Azevedo or JSK, LLC.

48. On information and belief, during the period of time from August 28, 2020 until December 31, 2020, Advoque made one or more distributions or payments to Shrater or Minimus Brands, LLC.

49. On information and belief, during the period of time from August 28, 2020 until December 31, 2020, Advoque paid Ciasom LLC, a company that is owned, directly or indirectly, in whole or in part, by Azevedo, more than a million dollars as "reimbursement" for expenses.

50. Pursuant to the collapsing doctrine, payments to entities controlled by the Individual Defendants should be considered payments to the Individual Defendants.

## CLAIMS FOR RELIEF

### COUNT I: FRAUD
### (Against All Defendants)

51. Titus incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

52. To induce Titus into purchasing N95 respirators, Defendants made numerous representations that Defendants knew or should have known were false, and/or stayed silent when other Advoque executives made representations that the Individual Defendants knew or should have known were false.

53.     In particular, on or about August 20, 2020, Defendants represented to Titus COO Jordan Miller that Advoque tested every lot to confirm compliance with NIOSH standards for N95 respirators and that all Advoque respirators complied with NIOSH N95 standards.[5]

54.     Titus reasonably relied on Defendants' statements, who had unique and superior knowledge of their testing procedures and standards.  Titus, through the exercise of ordinary diligence, could not have discovered what tests, if any, Advoque was actually running or the results Advoque was receiving.

55.     The NPPTL tested a total of twenty Advoque respirators on two separate occasions—August 28, 2020 and December 8, 2020—and all twenty respirators failed to pass the standards required for NIOSH-approved N95 particulate respirators.

56.     Either Defendants made misrepresentations about the rigorous testing of every lot or Advoque tested every lot and knew that its respirators did not satisfy the requirements for NIOSH-approved N95 respirators.

57.     Under either circumstance, Defendants are liable for fraud.

58.     As a result of Defendants' fraud, Titus has suffered damages of at least $6,827,575.

**COUNT II: FRAUDULENT TRANSFER**
**(Against all Defendants)**

59.     Titus incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

60.     Through transfers to insiders, as explained in more detail below, Defendants violated (a) the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439.04, and California common law regarding fraudulent transfers; (b) the Texas Uniform Fraudulent Transfer

---

[5] The Individual Defendants were all present during the tour when the statements were made regarding the testing of Advoque respirators.

Act, Tex. Bus. & Comm. Code Ann. § 24.001; and (c) the New York Uniform Voidable Transactions Act, N.Y. Debt. & Cred. Law §§ 270–281 (2019).

61. On information and belief, Advoque was formed in June 2020 with little or no assets or capital, but it engaged in a business where it would sell hundreds of millions of dollars in personal protective equipment that was intended to protect individuals from deadly viruses and other hazardous substances. Instead of investing capital in its business, Advoque relied on customer deposits to fund its operations. Advoque had unreasonably small assets and capital for the nature of its business.

62. At some time on or shortly after August 28, 2020, NIOSH and/or the CDC notified Advoque that its respirators, including the tens of millions of dollars in respirators that it had sold to customers like Titus and the State of California, could not be used or sold. At the time, Advoque was ramping up to produce millions more respirators.

63. The Individual Defendants, who are the founders, officers, and principals of Advoque, controlled its finances and operations.

64. On information and belief, Defendants acted with actual intent to hinder, delay, or defraud creditors by causing Advoque to distribute and pay millions to the Individual Defendants (directly and/or through entities controlled by the Individual Defendants), including a $6,145,599.95 "commission" (most of which was paid to Advoque insiders) and a $7,200,000 dividend or distribution to the Advoque principals.

65. On information and belief, Titus alleges that several "badges of fraud" show that the transfers were made with actual intent to hinder, delay, or defraud creditors, including:

    a. The transfers were to insiders;

    b. The transfers were concealed from creditors;

    c. The transfers included substantially all of Advoque's liquid assets;

    d. The value of any consideration received by Advoque was not reasonably equivalent to the value of the assets transferred; and

    e. The transfers occurred shortly before or after the substantial return obligation was incurred.

66. On information and belief, Titus also alleges that the transfers were constructively fraudulent because the transfers were made without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Advoque was engaged in a business for which the remaining assets were unreasonably small in relation to the business.

67. Titus seeks to recover the value of the assets that were fraudulently transferred plus Titus's reasonable attorneys' fees.

### COUNT III: BREACH OF CONTRACT
### (Against Advoque)

68. Titus incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

69. Advoque breached the Manufacturing Agreement by:

    a. providing respirators to Titus which did not meet or exceed the minimum Specifications (§ 2 of the Manufacturing Agreement);

    b. providing respirators that did not strictly conform to the Specifications, that were not merchantable, and that were not fit for their intended purpose (§ 9 of the Manufacturing Agreement);

    c. failing and refusing to refund amounts paid by Titus after Titus returned defective products and after Titus had tendered additional non-compliant and non-conforming respirators (§ 4(a) of the SOW attached to the Manufacturing Agreement and § 10 of the Manufacturing Agreement);

    d. failing to properly test each and every lot manufactured to confirm compliance with the Specifications and failing to make necessary changes to the manufacturing process before supplying respirators to Titus (§ 4 of the Manufacturing Agreement);

    e. failing to indemnify Titus for the costs of the recall of the respirators (§ 11(a) of the Manufacturing Agreement); and

  f. failing to indemnify Titus for Advoque's failure to comply with any Laws, which include "the specifications prescribed by applicable United States federal laws and the laws of the State of California governing the manufacturing, packaging, labeling, advertising, production, promotion, marketing, sale, and resale of such Products, including applicable **regulatory and other testing and/or certification requirements for the Products.**" (§§ 2 and 11(a) of the Manufacturing Agreement (emphasis added)).

70. As a result of Advoque's breach of the Manufacturing Agreement, Titus has incurred damages of at least $6,827,575.

71. In addition to its actual damages, Titus seeks to recover its reasonable attorneys' fees as provided by Section 11(a) of the Manufacturing Agreement.

## CONDITIONS PRECEDENT

72. All conditions precedent to Titus' recovery of the relief requested herein have been performed, have occurred, or have been waived.

**PRAYER FOR RELIEF**

Titus respectfully requests that this Court:

a. award to Titus actual damages;

b. award to Titus its reasonable costs and attorneys' fees incurred in pursing this action;

c. award to Titus pre- and post-judgment interest; and

d. award to Titus such further relief to which it is entitled.

Dated: May 10, 2021

>Respectfully submitted,
>
>WINDELS MARX LANE & MITTENDORF LLP
>
>By: __/s/ Scott R. Matthews_____
>　　　Scott R. Matthews
>156 West 56th Street
>New York, New York 10019
>Tel: (212) 237-1000
>Fax: (212) 262-1215
>smatthews@windelsmarx.com
>
>
>REESE MARKETOS LLP
>Joel W. Reese (*Pro Hac Vice Admission to be submitted*)
>State Bar No. 00788258
>joel.reese@rm-firm.com
>Tyler J. Bexley (*Pro Hac Vice Admission to be submitted*)
>State Bar No. 24073923
>tyler.bexley@rm-firm.com
>750 N. Saint Paul St., Suite 600
>Dallas, Texas 75201-3202
>214.382.9810 telephone
>214.501.0731 facsimile
>
>*Attorneys for the Plaintiff*

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury to decide all issues so triable in this case.

Dated:   May 10, 2021

                Respectfully submitted,

                WINDELS MARX LANE & MITTENDORF LLP


                By:  __/s/ Scott R. Matthews_____
                    Scott R. Matthews
                156 West 56th Street
                New York, New York 10019
                Tel: (212) 237-1000
                Fax: (212) 262-1215
                smatthews@windelsmarx.com

                REESE MARKETOS LLP
                Joel W. Reese (*Pro Hac Vice Admission to be submitted*)
                State Bar No. 00788258
                joel.reese@rm-firm.com
                Tyler J. Bexley (*Pro Hac Vice Admission to be submitted*)
                State Bar No. 24073923
                tyler.bexley@rm-firm.com
                750 N. Saint Paul St., Suite 600
                Dallas, Texas 75201-3202
                214.382.9810 telephone
                214.501.0731 facsimile

                *Attorneys for the Plaintiff*